

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00086-CV

IN THE INTEREST OF A.R.F.,
A CHILD

----------

### FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Mother and Father appeal the

termination of their parental rights to their son A.R.F.  In four issues, Mother and

Father both argue that the evidence is legally and factually insufficient to support

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal was filed).  We note that briefing was completed in this appeal on July 1, 2013, and that our opinion is required to issue on or before September 4, 2013, leaving this court with sixty-five days to review the appellate record, consisting of approximately 1,200 pages, and to draft, circulate, and issue this opinion.

the termination of their parental rights under Texas Family Code section 161.001(1)(D), (E), and (N) and section 161.001(2).[3]  We will affirm.

## II. Factual and Procedural Background

### A. Overview

The record reveals that Mother is the biological parent of seven children; that Father is the biological parent of six (or possibly five) children;[4] that none of the children live with Mother or Father; and that of those thirteen children, Mother and Father share only one child, A.R.F., who is the child involved in this appeal. Because Mother and Father challenge the best-interest finding and because the record contains conflicting testimony on drug use, domestic violence, child abuse, and service-plan compliance, we set forth a detailed summary of the record below.[5]

---

[3]Mother and Father filed separate briefs raising the same issues with the exception that Father challenges only the factual sufficiency of the evidence to support the best-interest finding, while Mother challenges both the legal and factual sufficiency of the evidence to support the best-interest finding.

[4]Multiple mothers, fathers, and children were referenced at trial; in an effort at clarity, we refer to A.R.F.'s mother as Mother, to A.R.F.'s father as Father, to other mothers and fathers by fictitious names, and to other children by initials. See Tex. R. App. P. 9.8(b)(1).

[5]The record also contains conflicting testimony on whether Mother and Father visited A.R.F. while he was at his grandparents' house.  Because we decide this case on endangering conduct grounds under subsection (E), rather than abandonment grounds under subsection (N), we do not include in the factual background the conflicting testimony regarding the visits.

## B. Prior CPS History

In May 2000, Father's son O.F. arrived at Cook Children's Hospital with a skull fracture and petechiae on his upper torso and on the tip of his penis. Father, the mother of the child, and an aunt were all named as perpetrators; they were not able to explain how the injuries occurred. As a result, O.F. was removed, and the Department of Family and Protective Services (the Department) opened a case. Father testified that he was not even around O.F. during that time.

The Department found in May 2005 that Steve, the father of several of Mother's children, was abusing Mother and the children.

Bron Gose, an investigative supervisor with the Department, testified that he had supervised an investigation in 2008 involving Father. The case was disposed of as reason to believe for neglectful supervision of P.F. and J.F. by their mother, Brenda, as well as reason to believe for physical abuse of P.F. and J.F. by Father.

In October 2008, Father assaulted Brenda in a domestic dispute. In February 2010, Father assaulted Brenda. Father admitted that he had a CPS case due to domestic violence against Brenda and that he was convicted for assaulting Brenda.

Mother testified that she had a CPS case against her in 2009 when A.S. tested positive for cocaine at birth. Mother testified that she was not offered services because she was working; instead, the caseworker came weekly and drug tested Mother.

3

## C. Removal of A.R.F.

Gose[6] testified that the Department had received a referral on November 29, 2011, stating that the children were outside without any adult supervision, that there were concerns about the home's appearance and drugs in the home, and that one of the children had been seen with bruises. A few days later, on December 2, 2011, the Department received a referral that one of the children had bruises on his body and that there was a concern about drug use in the home.

The "Contact Narrative," which was admitted as an exhibit during the trial, states that Officer White with the Fort Worth Police Department went with a caseworker[7] to the residence at 2:30 p.m. on December 2, 2011. The narrative states that there were six unstable bricks leading to the entrance of the residence and that there was a urine odor coming from the bushes next to the front door.

Mother answered the door and said that the police had come to the residence thirty to forty-five minutes prior to the caseworker and Officer White's arrival. Mother allowed the caseworker and Officer White to enter the residence, and the caseworker immediately smelled a "strong, heavy odor, which was later

---

[6]Neither of the Department's investigators who responded to the referrals in the present case testified at trial. Instead, their investigative supervisor Gose provided testimony about the referrals and the removal of the children based on what the investigators had told him and based on paperwork that he had reviewed.

[7]The name of the caseworker is not given; it appears that it may have been CPS Investigator Demetra Lee.

identified as marijuana." The caseworker observed three electric heaters in three different plugs in the first room, which she noted is a safety hazard. The caseworker noted that a child who was a few months old was sleeping with covers around him, which is a safety hazard. The trash can in the restroom contained used pieces of toilet paper with feces on them, which is a safety hazard, and the toilet had feces residue in it.

The caseworker's narrative states:

> Officer White found a closet where there was evidence of marijuana being grown in the residence. The closet had a homemade ventilation system for the plants, overhead lights, and foil to reflect the lights for the plants['] growth. There were also two green leaves that were small pieces from the marijuana plant and a homemade water filtering system.[8] The door to this closet did not completely close and was [accessible] to the children, which is a safety hazard.

The caseworker addressed the allegations with Mother and Father, and both agreed to take an oral swab drug test. Mother's test was positive for amphetamines, and Father's test was positive for methamphetamine. Mother repeatedly stated that she did not use any drugs. Father stated that he liked to "have a joint or two after work." Father admitted only to marijuana use; he said that the joints that he had smoked were not laced with anything.

There were three children in the home: L.A., C.A., and A.R.F. The caseworker noted that L.A. had a purple bruise on his upper chest, a green

---

[8]CPS Investigator Christine Martin's affidavit notes that "Officer White stated that there appeared to be evidence that marijuana was being grown in the home; no marijuana was found by law enforcement at this time."

bruise on his upper back, and a red bruise on his right leg. C.A. told the caseworker that her brother L.A. had received the bruises from Father. The caseworker asked L.A. how he got the bruises, and he stated that Father had "hit him like this," which L.A. demonstrated by putting his hand to his chest, because Father was mad at him, though L.A. said that he had not done anything wrong. C.A. told the caseworker that Father hits Mother when L.A. is not around but that he had never hit her (C.A.) or A.R.F.

As the caseworker was obtaining information on possible placements, CPS Investigator Martin arrived at the residence. The caseworker and Martin were informed by Officer White that Mother and Father were being arrested on outstanding warrants and were being taken to jail.

Martin called Gose and requested that the three children who were in the home be placed outside the home. Gose approved the request because Mother and Father had been taken to jail and because Mother and Father had tested positive for controlled substances on oral swab screens. C.A. and L.A. were placed with their father's mother.

Father's sister Linda and her husband came to the residence and took an oral swab drug test; they were both negative for all substances. A.R.F. was placed with Linda and her husband.

Shortly after the placement, Linda took A.R.F. to Cook Children's Hospital for a hair follicle drug test. A.R.F. tested positive for methamphetamine and cocaine.[9]

Father called Martin on January 6, 2012, and he agreed to meet her on January 9, 2012. He would not disclose where he and Mother were living.

On January 15, 2012, Martin's narrative states that the case was staffed because neither parent had made any attempt to be in contact with CPS. It further states that the family had a substantial history of not cooperating with services and that Father has had multiple removals. The Department concluded that there was reason to believe the allegations of neglectful supervision of L.A., C.A., and A.R.F. by Father; that there was reason to believe the allegations of neglectful supervision of L.A., C.A., and A.R.F. by Mother; that there was reason to believe the allegations of physical abuse of L.A. and A.R.F. by Father; and that there was reason to believe the allegations of physical abuse of L.A. and A.R.F. by Mother. The Department filed this case in February 2012 because Father told the caseworker that he was not agreeing to work services.[10]

---

[9]The record contains inconsistent testimony regarding whether A.R.F. also tested positive for amphetamines. The hair analysis results from the lab reveal that A.R.F. tested positive for the class of amphetamines; within that class, A.R.F. tested negative for amphetamines and positive for methamphetamine.

[10]From December 2, 2011, until February 2012 when the Department filed its petition, neither Gose nor his investigators knew the location of Mother and Father.

## D. CPS Caseworker Martinez's Testimony

Concepcion Martinez, a caseworker with the Department, testified that she had received the case in April 2012 and had remained the caseworker until August 31, 2012. She reviewed the investigation and was informed of some of the previous CPS history involving the parents. Martinez testified that her concerns about Mother included her history with CPS, her drug use, and A.R.F.'s testing positive for methamphetamine and cocaine. Martinez testified that her concerns about Father included his history with CPS and his drug use.

Martinez's first contact with the parents occurred on May 30, 2012, when she met with them in her office and went over the service plan with them. Martinez testified that Mother and Father's service plan required them to complete the ROADs (Recovery Offering Alternatives to Drugs) program, which is a drug education class that addresses drug issues with parents; to refrain from criminal activity; to establish a stable and safe housing environment for the children; to visit with the children; to attend individual counseling with Merit Family Services; to successfully complete and participate in the STEP parenting classes; to complete a drug assessment with Resource Recovery Council; to submit to random drug testing; and to maintain stable employment. Mother and Father both signed the family service plan that states, "[Mother] and [Father] will be expected to comply with all requests for random drug testing. Failure to comply within the time frame requested will be an assumed positive result."

During the May 30 meeting, Mother and Father told Martinez that they did not have stable housing; they were moving from motel to motel. Mother and Father did not have a phone, but they agreed to call Martinez every Monday morning to maintain contact with her, as required under their service plan. However, neither Mother nor Father agreed to take a drug test on May 30, and Martinez explained to Mother and Father that a refusal would be considered a positive drug test.

Mother and Father did not call Martinez every Monday morning as they had agreed. Martinez talked to Mother on the phone on August 6 about how her services were going. Mother said that she did not have a stable address; she was living with her brother but would have to move soon. Mother said that she was attending parenting classes on Thursdays. Mother told Martinez that she works until 5:00 p.m. every day and that she works until noon on some Saturdays, so she could not work other services. Martinez explained that individual counseling could be done on the weekends, and Mother did not have an excuse for not attending individual counseling sessions. Also during the phone call, Mother told Martinez that she was no longer a couple with Father. Martinez encouraged Mother to be more proactive in working her services if she wanted A.R.F. to be returned to her. Martinez set up an office meeting with Mother for August 16, 2012, but Mother did not come to the meeting.[11]

---

[11]Mother and Father also did not attend the status review hearing on August 1, 2012.

As of August 31, 2012, when Martinez finished as the caseworker, neither Mother nor Father had taken a drug assessment, they had not completed any services, nor had they provided Martinez with a verifiable residence[12] or verifiable employment.[13]   Martinez testified that she had received emails and progress reports from Merit Family Counseling stating that Mother and Father had started counseling, and she noted that they were also actively participating in parenting classes.   Martinez was not aware of any criminal acts committed by Mother. Martinez was not aware of any drug use by Mother or Father while Martinez was assigned to the case.

### E.  Mother's FBSS Caseworker Johanningmeier's Testimony

Jeannie Johanningmeier, a caseworker in family-based safety services (FBSS) with the Department, testified that she served as Mother's caseworker from February to September 2012 on a case involving her five oldest children who were not fathered by Father.  The FBSS case originated due to allegations of physical abuse of the two younger children by Father and to concerns of drug abuse.   At the time of the termination trial, the five children remained in a voluntary placement with the paternal grandparents.

Johanningmeier met with Mother on September 12, 2012, and told her that her new caseworker would be Michelle Barker.  Johanningmeier asked Mother to

---

[12]Father was moving from motel to motel.

[13]Father told Martinez that he was working, but he did not provide any details.

take an oral swab drug test.  Mother declined to take the test and said that she would rather take the test with Barker because that case had court involvement.

## F.  CPS Caseworker Barker's Testimony

Michelle Barker, a caseworker with CPS, testified that she had been assigned to A.R.F.'s case since September 1, 2012.  Barker attempted to contact Mother and Father when she received the case, but she was not successful because when she dialed the phone number that she had received from Martinez, a recording stated that the number had been disconnected.[14]

Mother eventually contacted Barker later in September while Mother was at the CPS office taking the ROADs class.  Barker asked Mother for a drug test that day in September 2012 because she knew that Mother had told Johanningmeier that she would take a drug test for her caseworker.  But Mother told Barker that she would not take a drug test from CPS.

At a hearing on October 11, 2012, Mother and Father made it clear to the trial court that they were continuing to refuse drug tests.  James Masek, the attorney ad litem, advised that he would be requesting that drug tests be ordered for both Mother and Father.

A hearing was held on November 6, 2012, on the ad litem's request to order Mother and Father to take drug tests.  Barker tried to locate Mother and

---

[14]The family service plan as of September 18, 2012, states that Mother and Father do not have a stable home, that they have not maintained appropriate contact with the caseworker, and that they have not made contact with the caseworker to visit with their child.

11

Father to tell them about the hearing, but she was not able to locate them using the phone number that they had provided the Department at the October 2012 hearing. Barker also spoke to Linda, who had no additional contact information for Mother and told Barker that Father was in jail. Mother did not appear for the November 6 hearing, but her attorney was present. The trial court granted the ad litem's motion in part, ordering Mother to submit to a hair follicle test by November 13, 2012.[15] Mother did not take the test.

Barker testified regarding Mother's and Father's compliance with their service plans. Mother completed her parenting classes, counseling, and the ROADs class. Mother refused drug tests[16] and did not complete a drug assessment. Barker testified that this concerned her because of the allegations that A.R.F. had been removed due to drug use by the parents and because he had tested positive for drugs.[17] Mother did not keep in contact with Barker during the case. Mother had not provided Barker with proof of her employment. Barker testified that she had asked Mother for proof of employment when she had first met her in September 2012 and when she had met Mother in January 2013. Mother told her in September 2012 that she worked helping her sister clean

---

[15]Father was not ordered to take the test because he was in jail at the time.

[16]Barker later testified that Mother took an oral swab drug test on January 14, 2013, which was approximately two weeks before the termination trial. Barker did not testify regarding the results.

[17]Barker testified that she did not know how drugs had gotten into A.R.F.'s system.

homes and was paid in cash, and Mother told Barker in January 2013 that she had just started a job and had not yet been paid.[18]

Barker met Father only once at a court hearing in October 2012. Barker did not observe any visits between Father and A.R.F. Father never gave Barker pay stubs to verify his employment. Father did not complete his counseling classes. Barker testified that it was the Department's position that Father did not complete his parenting class.[19] Father refused drug tests after the initial swab on December 2, 2011, and did not complete a drug assessment. Father committed two criminal offenses and was convicted of both offenses while the case was pending.

Mother's and Father's testimony at trial regarding where they had been living during the case was not consistent with what they had told Barker. Mother had lived three places since September 2012, which Barker testified was not considered stable housing. Barker had not been to any of Mother's homes, so she had no way of knowing whether they were appropriate for A.R.F.

[18]Mother testified that Barker did not ask her for proof of employment in September 2012 but that Barker did ask her on January 14, 2013, to which Mother responded that she had not yet been paid.

[19]Amanda Smyers, a supervisor with CPS, testified that she had met Mother and Father when they had attended the parenting group during the summer of 2012. Mother gave Smyers the evaluation on her final night of parenting classes. Mother also gave Smyers an evaluation showing that Father had completed the class, even though he was not in attendance at the final class, and said that her caseworker had pre-approved his absence. Smyers gave Mother his certificate in his absence. Martinez testified that she did not tell Mother that she could pick up Father's parenting certificate in his absence.

13

Barker testified that during the one visit that she had observed with Mother and A.R.F. on January 14, 2013, when he was approximately twenty months old, Mother acted appropriately with A.R.F. Although Mother was loving, read to him, and played with him, A.R.F. kept getting up to retrieve his sippy cup and was ready to walk out the door; Barker did not see that A.R.F. was bonded with Mother. Barker testified that A.R.F. looked at Mother like he did not know who she was. About forty-five minutes into the two-hour visit, A.R.F. gathered his belongings and walked to the door. When Mother went to get him, he started crying and would not stop; he kept pointing at the door, indicating that he was ready to leave. Barker told Mother that she could have the full two hours, but she declined and said that A.R.F. wanted to leave.

Barker visited A.R.F. in Linda's home every month except the month of the termination trial (January 2013). Barker testified that A.R.F. is doing well with Linda and her husband; A.R.F. is healthy and happy. Barker testified that Linda and her husband demonstrated throughout the case that they are able to provide for A.R.F.'s physical and emotional needs and have a very stable home. Linda and her husband indicated that they are willing to adopt A.R.F.

## G. Linda's Testimony

Linda testified that Father is her older brother. A.R.F. was living with Linda and her husband at the time of the termination trial and had been living with them since December 2011, when Mother and Father were arrested. Linda testified that A.R.F. has bonded to Linda's children.

14

At the visits that Linda observed, Mother greeted A.R.F., picked him up, hugged him, and kissed him. Linda described A.R.F. as a "very rambunctious kid" and said that he ran around Mother. Linda said that he would sit on her lap. Mother was loving towards A.R.F. during the visits and told A.R.F. to "go to mommy," meaning Linda. Mother also told A.R.F. that she had seen Father in January 2013, which is while he was in jail.

Father was appropriate with A.R.F. during the visits that Linda observed; he parented appropriately and tended to A.R.F.'s needs during the visits. A.R.F. seemed excited to see Father. Linda was reluctant to say whether there was a bond between Father and A.R.F. at the time of the termination trial because it had "been a long time since he's seen him." Linda testified that there was previously a bond between Father and A.R.F.

Linda testified that she loves A.R.F. like a son, that she treats him like a son, and that she is willing to adopt him if Mother's and Father's parental rights are terminated. Linda testified that she could meet A.R.F.'s future financial needs.

### H. Mother's Testimony

Mother testified that she is the mother of seven children: V.S., who was born in 2002 when Mother was fifteen years old; R.A., who was born in 2004; C.A., who was born in 2006; L.A., who was born in 2007; A.S., who was born in 2009; A.A., who was born in 2010; and A.R.F., who was born May 24, 2011. R.A., C.A., L.A., and A.A. live with their paternal grandparents, and so does V.S.

even though she is not related to them.[20]  Mother said that the grandparents do not allow her to speak to her children.  A.S., who tested positive for cocaine[21] at birth, has lived with Mother's friend since June 2011.

Mother and Father are not married; they have been a couple since July 18, 2010.  Mother testified that before Father went to jail, he worked for his cousin doing painting and bodywork for forty to fifty hours per week.  Mother said that Father is "the one that took care of everything.  He took care of my kids for me."  Mother also said that her sisters took care of her children for her.  Mother testified that she did not see Father hit L.A. and that Father had never hit her.  When asked if she had ever seen Father be physically abusive toward A.R.F., Mother testified that Father "won't hit him."

For the early part of the case, Mother was moving from motel to motel.  Mother testified that she then lived with various relatives, including her grandmother, her brother, and her sister.  Mother testified that she gave the court an address on Gimper Avenue (off Berry Street) at the October 11, 2012 hearing,

---

[20]Mother testified that the paternal grandparents do not have legal custody of Mother's five children.  Mother testified that she had not had her parental rights to any of her children terminated.

[21]Some places in the hospital records state that A.S. "came up positive for Cocaine and marijuana," while the drug screen printout shows that A.S. was positive for "Cocaine metabolites."  The hospital records show that Mother's drug screen was negative for all items tested based on a urine sample collected on March 12, 2009, but Martin's affidavit states that Mother tested positive for cocaine and marijuana at A.S.'s birth on March 13, 2009.

16

even though she had moved to South Riverside Drive on October 3, because she was still using the previous address.

Mother testified that she was arrested on December 12, 2011, because she had an unpaid ticket for not wearing her seatbelt. Mother testified that CPS had given her a drug test upon her arrest and that she had tested positive for marijuana. Mother spent one day in jail; she could not recall how long Father had stayed in jail.

Mother testified that when A.R.F. was initially placed with Linda it was due to Mother's and Father's being arrested for unpaid tickets; CPS told them that the children were being removed because they were being arrested. Mother testified that A.R.F. had not been hurt, had not been exposed to drugs, and had not been wandering around the streets alone; he was well fed and clothed. Mother testified that all of A.R.F.'s physical and emotional needs were being met.

Mother knew only that A.R.F. had tested positive for cocaine; she was not aware that he had tested positive for methamphetamine. Mother agreed that she and Father were A.R.F.'s caregivers prior to his positive drug test. Mother could not explain why A.R.F. had tested positive for those drugs. Mother testified that there were no drugs in the home and that she did not give A.R.F. drugs and did not see Father give drugs to A.R.F. or expose A.R.F. to drugs. Mother said that Father's mother and sister also cared for A.R.F. but that they are not drug users. Mother testified that A.R.F. did not have any physical or developmental problems as a result of his exposure to drugs.

17

Mother admitted that she had refused the Department's requests for drug tests on several occasions and that she had been informed that her refusal would be considered a positive drug test. Mother testified that she had refused drug tests "[b]ecause there were false allegations. The first investigator that came out, Christine Martin, we'd done one drug test and there was three different types of drugs that came out dirty at three different times if -- it was just one drug test."

Mother testified that the last time she had smoked marijuana was when she was fourteen years old. Mother testified that A.S. was born in 2009 positive for cocaine because Mother was taking nasal spray for seasonal allergies. Mother testified that she had not used cocaine in the past[22] and that she and Father do not use drugs in the home.

Mother testified regarding her services and said that she and Father had worked their services together. Mother believed that she had undergone a drug assessment, but she had it confused with something else. Mother testified that she had completed the ROADs class. Mother said that she learned that it is not good to use drugs when pregnant because drugs can cause damage to the child.

---

[22]Hospital records reveal that Mother was admitted to Harris Methodist on February 27, 2005, when she was seventeen years old, for a fainting episode that had occurred after she had snorted an unknown quantity of cocaine. Mother admitted to hospital personnel that she had used cocaine about once a month prior to the fainting incident. The instructions from the hospital state, "Your exam shows that you have a problem with cocaine abuse." The additional instructions state, "[S]top using cocaine."

Mother testified that she had not used drugs since she had completed the ROADs class in September 2012.

Mother testified that she had completed individual counseling at Merit Family Services. Mother said that she had learned a lot in counseling and that she used what she had learned on a regular basis. She said that she was able to talk about her past in counseling and had learned that life is hard but you do not have to depend on drugs to get you through. Mother completed a relapse plan in counseling, even though the last time she had used marijuana was when she was fourteen, because "[her children's father] was on drugs[,] and they wanted to make sure I wasn't going to fall back and try to do it." If Mother has a craving for drugs, she said that she prays, talks to her family, writes things down, and gets together with family to help her think positive. Mother's support network includes her brother who is a pastor.

Mother testified that she had completed her parenting classes. Mother testified that Father had attended the last parenting class and that he was in the restroom when the completion certificates were handed out.

Mother testified that she had maintained steady, legal employment. At the time of the termination trial, Mother was working at Mail Presort; she said that it was located on Meacham but did not know the address; she had obtained the job through a temp service called Automation. Mother testified that she works 3:00 to 11:00 and had been working at Mail Presort during the three weeks prior to the termination trial. She works forty hours per week and receives $8 an hour.

Mother testified that her paychecks from Mail Presort are directly deposited into her account, so she had nothing to show the court that she was employed. Mother testified that prior to January 2013, she had performed housecleaning for her aunt off and on for approximately three or four years. She made approximately $200 per week.

Mother testified that at the time of the termination trial, she was living in an apartment with her sister on South Riverside Drive and had been there since October 3, 2012. She said that CPS had not visited her apartment. Mother said that her monthly expenses depend on what amount her sister asks her for. Mother said that she pays $50 every week for the house phone. Mother's other monthly expenses included "[w]henever I can manage to buy stuff for my son."

Mother was taking GED classes on Tuesdays and Thursdays and planned to take the GED exam sometime in the month following the termination trial.

Mother testified that she did not know about Father's criminal history until a few weeks after their relationship had started. When asked why she had a baby with Father after she had learned of his criminal history, Mother responded, "His past don't have nothing to do with me and him now." When asked if she knew that Father had a lot of convictions for family violence, Mother said, "That's not my business." Mother was present when Father committed the offense in October 2012 for which he was in jail at the time of the termination trial.

Mother testified that the visits with A.R.F. lasted a "few hours." Mother testified that she had played with A.R.F. during the visits and had talked to him

20

about Father who was not around. Mother did not tell A.R.F. that Father is in jail because A.R.F. is too young to understand.

Mother testified that prior to Father's incarceration in October 2012, he had visited A.R.F. every time that Mother did. Mother testified that Father's visits with A.R.F. were "[a]lways good," that A.R.F. was happy to see Father and would run to him, and that A.R.F. loves Father. Father would play with A.R.F., talk to him, watch movies with him, or play games with him. Father interacted with A.R.F. for the bulk of the visit. Mother testified that there is a bond between Father and A.R.F.; they love each other. Mother testified that Father cries every time that he sees A.R.F. and that "they're just real happy with each other." Mother testified that it is hard on Father not to be able to see A.R.F. while Father is in jail.

Mother testified that she and Father had not left A.R.F. with people who had used drugs or who were unsafe. Mother testified that she had never knowingly placed A.R.F. in a dangerous place or in emotional harm and that she had not engaged in conduct that would have placed him in harm.

## I. Father's Testimony

Father testified that A.R.F. is his only son;[23] he said that his sister lied when she testified that he is the father of O.F., J.F., P.F., I.F. (also referred to as A.F.), and C.F. Father later testified that he is the biological father of those children and that he believed that his parental rights to those children had been

---

[23]Father testified that his son's name is A.M.F. We use A.R.F. to be consistent with the name reflected in the pleadings filed by the Department.

21

terminated. Father testified that from day one, he had never tried to parent his five other children; he signed over his parental rights to his mother because it was in the children's best interest due to problems between him and the children's mother.

Father testified that he and Mother were getting married the week after the termination trial. Father testified that Mother loves A.R.F. "very much, very much" and that she was very caring and appropriate toward him. Father testified that A.R.F. loves Mother and knows who she is. Father testified that Mother is a very good parent and that he has no concerns about her caring for A.R.F.

Father said that he had been to jail more times than he could count.[24] He said that he had been arrested "a million times for tickets, tickets, tickets." Father

---

[24]The following judgments were admitted into evidence:

- A judgment signed October 25, 2012, reflecting that on or about August 2, 2012, Father committed the offense of theft of property under $1,500; that Father was convicted of that offense and two prior convictions; and that Father was sentenced to six months' confinement.
- A judgment from June 21, 2012, reflecting that on or about May 1, 2012, Father committed the offense of theft of property $50 to $500 and that Father was sentenced to thirty days' confinement.
- A judgment from March 12, 2010, reflecting that on or about February 23, 2010, Father committed the offense of assault/bodily injury of a family member and that Father was sentenced to 270 days' confinement.
- A judgment signed February 8, 2010, reflecting that on or about May 29, 2009, Father committed the offense of assault causing bodily injury to a family member and that Father was sentenced to nine months in jail.
- A judgment from June 26, 2006, reflecting that on or about July 17, 2005, Father committed the offense of assault/bodily injury of a

22

testified that on the day that A.R.F. was removed, Father was arrested for an unpaid ticket for not wearing a seat belt and spent four days in jail. Father said that no drugs were found. Father testified that after his arrest on the seatbelt ticket, they had to move to a motel because their landlord kicked them out of their house and that he lost his "car, everything."

Father was incarcerated at the time of the termination trial but appeared and testified at trial. Father was incarcerated for the October 22, 2012 theft of $50 to $500, which was enhanced based on his prior convictions.[25] Father believed that he would be released three or four weeks after the termination trial.

Father testified that A.R.F. was healthy, well fed, and clean when he was removed on December 2, 2011. Father said that the caseworker was very pleased at the condition that A.R.F. was in and "had nothing but compliments about that." Father testified that he did not have any idea how A.R.F. would have

family member and that Father was sentenced to 120 days' confinement.

- A judgment from June 26, 2006, reflecting that on or about April 18, 2005, Father committed the offense of assault/bodily injury of a family member and that Father was sentenced to 120 days' confinement.
- A judgment from September 27, 2002, reflecting that on or about June 14, 2002, Father committed the offense of driving while intoxicated and that Father was sentenced to forty-five days' confinement.
- A judgment from February 13, 1998, reflecting that on or about February 6, 1998, Father committed the offense of theft $50 to $500 and that Father was sentenced to five days' confinement.

[25]Father agreed that every conviction that he received in the future would be enhanced.

23

gotten into illegal drugs.  Father testified that he was not aware of leaving A.R.F. with anyone who had used drugs.  Father believed that the drug test showing that A.R.F. had tested positive for methamphetamine and cocaine was a lie.

Father testified that the only illegal drug he had taken was marijuana. Father testified that the last time he had smoked marijuana was approximately 2008.  Father later testified that he had told Christine Martin, the CPS investigator, that he had used marijuana three months prior to the drug test and that he had used it at work, not around his children.

Father testified that he understood that CPS had removed A.R.F. due to drugs and that throughout the case Father had refused to submit to drug tests and the drug assessment.  Father admitted that he had refused to take a drug test when Martinez had requested one in May 2012 and when Barker had asked him to take one in September 2012.  Father said that he did not know until the termination trial that each refusal to take a drug test counted as a positive result; Father said that Martinez was not telling the truth when she testified that Father knew that his refusals would count as positive tests.[26]  Father told the court in October 2012 that he had refused to take drug tests during the case because he felt like he did not get a fair result.  Father's understanding was that he had a

---

[26]But Father agreed that he had met with Martinez on only one occasion— May 30; that she went over his service plan with him; and that he understood what the rules were.

clean urinalysis on the day that A.R.F. was removed.[27]  Father said that later some of the paperwork showed that he had tested positive for methamphetamine and cocaine, while the service plan showed that he had tested positive for heroin. Father testified that he had never used any of those drugs.  Father testified that he had taken only one drug test during the case and that it came out with results for three different drugs on three different occasions.  Father explained that he got into an argument with Martin because she told him his urinalysis was clean at the time they removed A.R.F., and then she intimidated him by saying that he had been "bucking the system all these years[,] and she was going to make sure that I wasn't going to buck it this time and she was right."  The trial court signed an order allowing Father to be tested through an outside lab, but he did not take a drug test because he went to jail on the theft charge.  Father testified that he did not complete the drug assessment because of how he was treated during the drug test.

Father testified that he had completed the ROADs program at which he had learned that he should not go back to using marijuana because "that's the gateway drug to everything."

Father testified that Smyers had lied when she had testified that Father was not at the final parenting class.  Father testified that he had attended the last

---

[27]The Department's testimony centered on an oral drug swab test that was taken on the date the children were removed and made no mention of a urinalysis; conversely, Father's testimony centered on a urinalysis and made no mention of an oral drug swab test.

parenting class; "[a]t the last second," he left to use the restroom. Father testified that the teacher and the other thirty-five to forty-five students in the parenting class could vouch that he was in attendance on the last night. Father testified that he had learned from the parenting classes

> how to discipline a kid if it came to it, just the proper way. That was one of the things. And another one is how to love him, how to deal with him, how to talk to him, how to teach him, you know, instead of talking to him like a baby, talk to him like an adult.

Father testified that he has five of the twelve counseling sessions remaining; he was not able to complete them because of his incarceration. Father testified that he had completed all of his services, except for five sessions of counseling.

Father testified that during the visits, A.R.F. was very happy to see him because he parents A.R.F. more than anyone else. Father described A.R.F. as "a real happy, energetic kid." Father talked to A.R.F. during the visits. Father testified that he had tried to make the most of every visit with A.R.F. because he did not know when Linda would have time for another visit or when they would have a ride. Father believed that he was being a great father to A.R.F. Father testified that he is bonded to A.R.F., that he cared for him, and that he provided for his needs prior to the removal and bought diapers and other things for him after he was removed. Father testified that he had never physically hurt A.R.F. and that he had never physically neglected A.R.F.

Father's plan for employment after his release was to go back to work with his uncle doing bodywork, as he had done prior to his arrest, and to pursue his commercial driver's license; his dream is to drive an eighteen-wheeler. Father testified that his pay fluctuated from $200 a week to $2,000 a week, depending on insurance and whether there was a job to work on. Father hoped to consistently earn $1,200 per week as a truck driver so that he could buy a car and rent an apartment. Until then, Father planned to move into the apartment on South Riverside Drive with Mother and Mother's sister. Father testified that Mother's sister would help them until he could get on his feet.

## J. Recommendations

Mother testified that she loves her children and that it is in A.R.F.'s best interest to be returned to her. Mother testified that if A.R.F. were returned to her, she would continue to work and would have his grandmother watch him while she was at work; she had obtained a stable place to live and would provide safe housing for him. Mother testified that she and Father were planning to marry the week after the termination trial and that together they would raise A.R.F.[28] Mother also testified that she was working to obtain her GED in order "to do something better for myself to make my son happy in life so he can become a better person." Mother testified that she would not use drugs around A.R.F.

---

[28]Mother testified that Father's release date was scheduled to be April 23, 2013, but that "he's supposed to be getting out sometime sooner."

27

Father begged the trial court to deny the petition to terminate his parental rights.

Barker testified that the Department was asking the trial court to terminate Mother's and Father's parental rights to A.R.F. Barker testified that, other than the ROADs classes, Mother and Father never addressed their drug issues and had not satisfactorily demonstrated to the Department that they had overcome their drug problems. Barker stated that Mother and Father are in the same position, if not worse because Father is in jail, that they were in during December 2011 when A.R.F. was removed. Barker testified that it is in A.R.F.'s best interest to have Mother's and Father's parental rights terminated because A.R.F. is very bonded to his current family. Barker testified that A.R.F. had developed a parental bond with Linda and her husband because A.R.F. has been with the family since he was six months old and was almost two years old at the time of the termination trial. A.R.F. went to Linda and her husband for all of his needs. Barker explained that A.R.F. is in a safe and stable environment with Linda and her husband and that there are concerns about the parents' history with CPS and drugs, their failure to regularly visit A.R.F., and a lack of bonding between A.R.F. and Mother. Barker asked that the Department be named permanent managing conservator in order that A.R.F. could be placed for adoption because she believed it was in A.R.F.'s best interest.

The attorney ad litem, James Masek, testified that he supports the Department's petition to terminate. He pointed to Mother's and Father's four

positive drug tests, which were counted as positive by virtue of the fact that Mother and Father had declined to take them. Masek did not observe any visits and could not testify whether there was a bond between the parents and A.R.F. He could only testify regarding what he had seen between A.R.F. and Linda's family, and that was a very strong bond. Masek testified that if the child was removed at this point, "it would be devastating to the child." Other reasons that Masek provided to support the decision to terminate the parental rights included that Father is now in the felony range no matter what criminal offense he commits and will go to prison for a longer period of time and not be able to provide and that Mother never provided proof of employment or proof of a stable residence.

## K. Trial Court's Disposition

After hearing the above testimony and reviewing the evidence, the trial court found by clear and convincing evidence that A.R.F. was under one year of age when the petition for termination of the parent-child relationship was filed and that Father has not registered with the paternity registry. The trial court also found by clear and convincing evidence that Mother and Father had violated subsections (D), (E), and (N) of Texas Family Code section 161.001(1) and that termination of Mother's and Father's parental rights to A.R.F. was in his best interest. These appeals by Mother and Father followed.

### III. Unchallenged Paternity Finding Does Not Authorize Termination Under Facts Presented

The termination order contains the following finding:

> 9.1 The Court finds by clear and convincing evidence that the child was under one year of age when the petition for termination of the parent-child relationship was filed, and that [Father] has not registered with the paternity registry under Chapter 160 of the Texas Family Code and after the exercise of due diligence by the Department, his identity and location are unknown.

Father does not challenge the above finding. The State urges us to apply the general rule that prohibits a court from addressing challenged and unchallenged grounds when an appellant does not challenge an independent ground that may, under the record presented, support the judgment that appellant seeks to reverse. *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Because Father appeared at trial, unequivocally testified that he is A.R.F.'s biological father, and requested that his parental rights not be terminated, we decline to follow the general rule in light of the facts presented here and hold that Father triggered his right to require the Department to prove that he engaged in one of the types of conduct listed in Texas Family Code section 161.001(1) before his parental rights could be terminated. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also In re J.M.*, 387 S.W.3d 865, 872 (Tex. App.—San Antonio 2012, no pet.) (holding that section 161.002(b)(2) does not authorize an order terminating the parental rights of an

30

alleged father when his identity and location are known to the Department at the time of the final hearing and order).

## IV. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS ENDANGERMENT FINDINGS

In their second issues, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's endangering conduct findings under subsection (E).

### A. Burden of Proof and Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a]

31

parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment.

*Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parents violated section 161.001(1)(E) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

33

## B. Law on Endangerment

Endanger means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). It is not necessary to establish that a parent *intended* to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See M.C.*, 917 S.W.2d at 270. To prove endangerment under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125. Courts may look to parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. The Supreme Court of Texas has acknowledged that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."

34

*J.O.A.*, 283 S.W.3d at 345. The Houston First Court of Appeals has explained that illegal drug use may support termination under section 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. Additionally, illegal drug use during pregnancy can support a charge that the mother has engaged in conduct that endangers the physical and emotional welfare of the child. *In re M.L.B.*, 269 S.W.3d 757, 760 (Tex. App.—Beaumont 2008, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)).

A factfinder may reasonably infer from a parent's repeated failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's repeated engagement in illegal drug activity after agreeing not to do so in a service plan for reunification with her children may be considered in an analysis of whether clear and convincing proof exists of voluntary, deliberate, and conscious conduct that endangered the well-being of her children. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet). Further, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

35

Even though imprisonment standing alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012); *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). The Department is not required to show that incarceration was a result of a course of conduct endangering the child; it must show only that incarceration was part of such a course of conduct. *Boyd*, 727 S.W.2d at 533–34; *M.R.*, 243 S.W.3d at 819. When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure the child's safety and well-being, then such incarceration can be a part of a course of continuing conduct. *See M.R.*, 243 S.W.3d at 819. Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child can support a finding that a parent engaged in a course of conduct that endangered the child's well-being if the Department introduces evidence concerning the offenses and establishes that the offenses were part of a voluntary course of conduct that endangered the child's well-being. *E.N.C.*, 384 S.W.3d at 804–05; *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied).

A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective &*

36

*Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346.

### C. Endangerment Analysis

### 1. Father's Endangering Conduct

As set forth above, the record contains eight judgments related to various crimes committed by Father, including four convictions for assault/bodily injury of a family member. The record also contains Father's testimony that he had been to jail more times than he could count; that he had been arrested "a million times for tickets, tickets, tickets"; and that he was in jail at the time of the termination trial for a theft conviction that occurred while this case was pending. Father's testimony—that he and Mother were kicked out of their house and that they lost their "car, everything" after he was arrested in December 2011—reveals that his criminal violations and incarcerations affected his ability to provide a stable living environment for A.R.F.

The record also reveals that Father had admitted to using marijuana. Father testified that he told caseworker Martin he had last used three months prior to the time that A.R.F. was removed and that he had used while he was at work and not while he was around A.R.F. The caseworker's report noted that

37

Father told her that he liked to have a joint or two after work. Father believed that he had a clean urinalysis the day that A.R.F. was removed, though testimony and paperwork from Department workers revealed that Father had tested positive for methamphetamine on an oral drug swab test. Moreover, A.R.F. tested positive for methamphetamine and cocaine when he was removed from Mother and Father, who were his main caretakers prior to the removal. After the drug swab test on the day A.R.F. was removed, Father refused to submit to drug tests, and his refusals were considered positive drug results under his service plan. Father did not complete a drug assessment. Father did however complete the ROADs class and testified that he had learned that he should not go back to using marijuana.

The record also demonstrates that Father had CPS history prior to A.R.F.'s removal. That history included Father's inability to explain injuries to his son O.F. in May 2000, physical abuse of P.F. and J.F. by Father in 2008, and Father's assaults against his other children's mother, Brenda, in October 2008 and February 2010.

Moreover, at the time of A.R.F.'s removal, L.A. and C.A. were also removed. L.A. had several bruises that were allegedly inflicted by Father according to what both L.A. and C.A. told the caseworker. And C.A. told the caseworker that Father hits Mother when L.A. is not around. The Department concluded that there was reason to believe the allegations of neglectful

38

supervision of L.A., C.A., and A.R.F. by Father and that there was reason to believe the allegations of physical abuse of L.A. and A.R.F. by Father.

Although Father testified that following his release from jail on the theft charge he plans to return to his job as a "body man" and to make positive improvements in his life, including pursuing his commercial driver's license so that he can buy a car and rent an apartment, he was still incarcerated at the time of the termination trial and had never provided proof of his prior employment. And his brief history of attempting to work his services and improve his conduct was not enough to negate the probative value of his long history of criminal conduct and irresponsible choices. *See J.O.A.*, 283 S.W.3d at 346.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct or had knowingly placed A.R.F. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.O.A.*, 283 S.W.3d at 346 (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because father had a long history of drug use and irresponsible choices, including an arrest for domestic violence); *J.T.G.*, 121 S.W.3d at 131 (holding evidence legally sufficient to support endangerment

findings because father had a history of domestic violence, drug abuse, and criminal conduct).

Giving due deference to the factfinder's endangering conduct finding, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had engaged in conduct or had knowingly placed A.R.F. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See In re S.M.*, 389 S.W.3d 483, 492–93 (Tex. App.—El Paso 2012, no pet.) (holding evidence factually sufficient because father had multiple criminal convictions, including three convictions for assault causing bodily injury, and two of those involved domestic violence against child's mother); *In re N.S.G.*, 235 S.W.3d 358, 362–63, 368–69 (Tex. App.—Texarkana 2007, no pet.) (holding evidence factually sufficient to support endangerment finding because father had used drugs, had failed to submit to drug counseling, had physically abused his wife, and had engaged in criminal conduct).

We therefore hold that the evidence is legally and factually sufficient to support the trial court's endangering conduct finding as to Father. *See* Tex. Fam. Code Ann. § 161.001(1)(E). We overrule Father's second issue.

### 2. Mother's Endangering Conduct

Mother argues that the State failed to show a voluntary, deliberate, and conscious course of conduct. Mother specifically argues that the evidence that

she gave birth to a child who tested positive for cocaine at birth does not constitute a voluntary, deliberate, and conscious course of conduct.

Despite Mother's testimony denying drug use, the record demonstrates that she had a long history of drug use. Mother admitted that she had last used marijuana when she was fourteen. When Mother was seventeen, she was admitted to Harris Methodist following a fainting episode that had occurred after she had snorted an unknown quantity of cocaine; the hospital notes from Mother's exam revealed that she had a problem with cocaine, and she was instructed to stop using cocaine. Four years later in 2009, A.S. was born with cocaine in her system, though Mother testified that the positive test was due to her use of nasal spray for seasonal allergies while she was pregnant. And at the time of A.R.F.'s removal in 2011, Mother tested positive for amphetamines and was, along with Father, A.R.F.'s main caretaker prior to A.R.F.'s positive drug test following his removal. Mother refused a drug test on May 30, 2012, and two drug tests in September 2012; informed the court at the October 11, 2012 hearing that she was refusing drug tests; and thereafter failed to submit to a court-ordered hair follicle test by November 13, 2012.[29] Each refusal counted as a positive drug test. Mother also did not complete a drug assessment. The record thus displays an endangering course of conduct by Mother regarding drug use that endangered A.R.F.

---

[29]Mother did submit to a drug test two weeks before the termination trial, but the results were not reported during the trial.

Mother, like Father, also had prior CPS history. The Department found that Steve, who is one of the fathers of Mother's children, was abusing Mother and her children in 2005. Mother had a CPS case against her in 2009 when A.S. was born positive for cocaine. Following the removal of A.R.F., C.A. told a caseworker that she saw Father hit Mother and saw Father inflict bruising on L.A., though Mother testified that she did not see Father hit L.A. and that Father had never hit her. The Department concluded that there was reason to believe the allegations of neglectful supervision of L.A., C.A., and A.R.F. by Mother and that there was reason to believe the allegations of physical abuse of L.A. and A.R.F. by Mother. The evidence thus revealed that Mother had allowed her children to be exposed to endangering conduct from her through her drug use and to endangering conduct through physical abuse by Father and Steve.

Mother also moved frequently during the case. The record revealed that Mother had lived in three houses in four months, that she did not keep in contact with the caseworker, and that the caseworker had not been to any of Mother's homes. Mother also never provided proof of her employment to the Department.

Although Mother testified that at the time of the termination trial she had been living with her sister for almost four months, that she had recently started a full-time job at Mail Presort, that she and Father planned to marry the week after the termination trial, that she planned to sit for the GED exam the month following the termination trial, and that she would not use drugs around A.R.F., this testimony of improved conduct (or here, a plan for improved future conduct),

42

especially of short duration, does not conclusively negate the probative value of a proven, long history of drug use and irresponsible choices. *See, e.g.*, *J.O.A.*, 283 S.W.3d at 346.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct or had knowingly placed A.R.F. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.) (holding evidence—that mother had a drug problem—legally sufficient to support endangerment finding under subsection (E)); *see also In re C.J.S.*, 383 S.W.3d 682, 690 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (holding evidence legally sufficient to support endangering conduct finding because mother had engaged in a continuing course of conduct that had endangered the child based on mother's repeated use of cocaine while pregnant or taking care of a newborn, multiple failures to submit to drug testing, and lack of impulse control).

Giving due deference to the factfinder's endangering conduct finding, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had engaged in conduct or had knowingly placed

43

A.R.F. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See D.M.*, 58 S.W.3d at 813 (holding evidence—that mother had a drug problem—factually sufficient to support endangerment finding under subsection (E)); *In re E.W.A.*, No. 02-07-00135-CV, 2008 WL 1867144, at \*10 (Tex App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (holding evidence factually sufficient to support trial court's endangering conduct finding because mother had used illegal drugs before child was born, continued to use them after he was born, and also continued to use them during the pendency of the termination case; submitted to only six of twelve requested drug tests; and changed residences frequently); *see also C.J.S.*, 383 S.W.3d at 690 (holding evidence factually sufficient to support endangering conduct finding because mother had engaged in a continuing course of conduct that had endangered the child based on mother's repeated use of cocaine while pregnant or taking care of a newborn, multiple failures to submit to drug testing, and lack of impulse control).

We therefore hold that the evidence is legally and factually sufficient to support the trial court's endangering conduct finding as to Mother. *See* Tex. Fam. Code Ann. § 161.001(1)(E). We overrule Mother's second issue.[30]

---

[30]Along with a best-interest finding, which we discuss below, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.— Fort Worth 2007, no pet.). Because we hold that legally and factually sufficient evidence supports the termination of Mother's and Father's parental rights under section 161.001(1)(E), we need not address Mother's and Father's first and third

44

## V. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS BEST-INTEREST FINDING

In their fourth issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding, and Father challenges the factual sufficiency of the evidence to support the trial court's best-interest finding.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

---

issues challenging the section 161.001(1)(D) and (N) findings. *See* Tex. R. App. P. 47.1 (stating that appellate court need address every issue necessary for final disposition of appeal).

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Mother's best-interest analysis does not apply the *Holley* factors but instead argues that A.R.F. should be returned to her because she "substantially complied" with six tasks on her service plan and "adequately explained" her failure to comply with the remaining tasks. A parent's performance under a service plan is likely to be relevant to several of the factors stated in *Holley* and therefore relevant to the best-interest element of section 161.001(2). *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.). We will therefore weigh each of the nine factors set forth above.

With regard to A.R.F.'s desires, he was twenty months old at the time of the termination trial, and thus his desires were unknown. The record revealed that A.R.F. is doing well with Linda and her family; that he is healthy and happy; that he is strongly bonded to Linda's family, whom he had been living with since

46

he was six months old; that he went to them for all of his needs; and that Mother had told A.R.F. to "go to mommy," meaning Linda. During the one visit that Barker had observed two weeks before trial, A.R.F. did not appear to recognize Mother, did not appear to be bonded with Mother, and ended the visit an hour and fifteen minutes early. Both Mother and Linda testified that there was previously a bond between Father and A.R.F., but Linda was reluctant to say whether there was still a bond at the time of the termination trial because Father had not been able to visit with A.R.F. during the four months prior to the termination trial due to his incarceration. The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

With regard to the emotional and physical needs of A.R.F. now and in the future, he requires basic needs: food; shelter; clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to his age. The attorney ad litem described A.R.F. as a year and half old and "a very active boy," who is very outgoing and appears to be social as well. The record revealed that A.R.F. has seasonal allergies and suffers from ear infections. A.R.F. did not appear to have any developmental needs and did not exhibit any high-risk behaviors. Relevant to this factor, Mother testified that all of A.R.F.'s physical and emotional needs were being met, but neither Mother nor Father had submitted documentary proof to the Department, as required by their service plans, to support their testimony

47

regarding their employment, income, and financial ability to provide for A.R.F.'s physical needs. Following Mother's and Father's arrests in December 2011, they lost their home and their car and did not have stable housing during the case. The record reveals that A.R.F. was healthy, well fed, and clean when he was removed, though his half-brother L.A., who was removed at the same time, had bruises on his body that were allegedly inflicted by Father. Though Mother denied any physical abuse by Father, the child C.A., who was also removed at the time of A.R.F., told the caseworker that Father had also hit Mother. At the time of the removal, the home had a strong odor of marijuana; there was a closet where marijuana was being grown, and the closet door was accessible to the children; and there were multiple other safety hazards described in the caseworker's report. The Department did not know whether the home where Mother was living at the time of the termination trial was appropriate for A.R.F. Based on the housing instability, domestic violence, and uncertainty regarding Mother's and Father's ability to provide for A.R.F.'s physical needs, the trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

With regard to the emotional and physical danger to A.R.F. now and in the future, the record demonstrates that Mother had lived with men who were abusive to both her and her children and that A.R.F. was twenty months old and thus could not protect himself or leave on his own if domestic violence occurred. The record reveals that Father had four convictions for assault/bodily injury to

48

family members, that he was considered among the perpetrators of injuries to his son O.F., that he had hit Mother and her son L.A., and that he had not shown an ability to obey the law for any sustained length of time. The record also includes evidence of Mother's and Father's drug use. Mother denied using cocaine, despite that she had been admitted to the hospital following a fainting episode that occurred after cocaine use, that A.S. had tested positive at birth for cocaine, and that A.R.F. had tested positive for cocaine after his removal. Father admitted using marijuana, just not at home, and tested positive for methamphetamine at the time of A.R.F.'s removal. A.R.F. also tested positive for methamphetamine shortly after he was removed. The trial court thus could have reasonably concluded that Mother and Father had exposed A.R.F. to drugs. Due to the prevalent domestic violence, physical abuse, and drug abuse, the trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

With regard to parenting abilities, the evidence detailed above reveals that although Mother and Father expressed their love for A.R.F. and appeared to interact well with A.R.F. during visits, Mother and Father did not provide for A.R.F.'s physical and emotional needs and had not eliminated the physical and emotional dangers to A.R.F. Although Mother and Father both received certificates showing that they had completed parenting classes and stated that they had learned from those classes, Department personnel did not believe that Mother and Father had overcome their drug problems because they had refused

49

to take drug tests and did not complete the drug assessments required by their service plans. Moreover, Father remained in jail at the time of the termination trial and could not parent A.R.F. from jail. The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

With regard to the programs available to assist Mother and Father to promote the best interest of A.R.F., the record reveals that they had not worked all of the services available to them to promote the best interest of A.R.F.; there was also evidence that Mother and Father had not overcome their drug addictions. The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

Mother testified that if A.R.F. were returned to her, she would continue to work and would have his grandmother watch him while she was at work; that she would provide safe housing for A.R.F.; that she and Father would raise A.R.F.; that she would not use drugs around A.R.F.; and that she would work to obtain her GED in order "to do something better for myself to make my son happy in life so he can become a better person." Father planned to work with his uncle doing bodywork until he could obtain his commercial driver's license and rent an apartment and buy a car. The Department planned for A.R.F. to be placed for adoption with Linda and her husband. Because Mother and Father had not shown stability or the ability to turn their plans into a reality at the time of the

termination trial, the trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

The stability of the home that Mother and Father had proposed during the termination trial, which was Mother's sister's apartment, was unknown because Mother claimed to have lived there for four months, but the Department had not visited the apartment. The record did not reveal any instability in the home that the Department had proposed for A.R.F. The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

With regard to the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Mother's and Father's drug use; Mother's and Father's failure to meet A.R.F.'s physical and emotional needs; Mother's and Father's failure to address the physical and emotional dangers to A.R.F., including the drug abuse by both parents, A.R.F.'s testing positive for drugs after he had been in their sole care, and Father's multiple convictions; and Mother's and Father's failures to take advantage of the services that were offered to ensure that they had overcome their drug issues—reveals that the existing parent-child relationships between Mother and A.R.F. and Father and A.R.F. are not proper relationships. The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

51

With regard to any excuse for Mother's acts or omissions, the record revealed that both Mother and Father had refused to take drug tests during the case because they believed that the positive drug tests at the time of A.R.F.'s removal were "false allegations." Mother testified that she thought that the drug assessment was "something else" that she was already doing and did not realize that she had not completed it. Mother repeatedly failed to admit that she had a drug problem and blamed A.S.'s positive drug test on Mother's use of nasal spray. Father testified that A.R.F.'s drug test results were a lie and that several of the witnesses who had testified had lied. Father's excuse for Mother's picking up his parenting certificate was that he went to the restroom at "the last second." The trial court was entitled to find that this factor weighed in favor of termination of Mother's and Father's parental rights to A.R.F.

After weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights to A.R.F. is in his best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *M.R.*, 243 S.W.3d at 820–21 (holding evidence factually sufficient to support best-interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain

housing and employment, and children flourished in foster care); *In re J.L.C.*, 194 S.W.3d 667, 675–77 (Tex. App.—Fort Worth 2006, no pet.) (holding evidence factually sufficient to support best-interest finding because although mother had attended parenting classes and was attempting to overcome her drug addiction, mother had difficulty putting her child's needs ahead of her own; had exposed child to drugs when pregnant and continued to use after child was removed; was involved in a life of crime, unemployment, homelessness, and addiction; and could not provide a stable home); *see also C.J.S.*, 383 S.W.3d at 691–95 (holding evidence legally and factually sufficient to support best-interest finding because mother had not become a self-sufficient parent at the time of the trial and had failed to comply with significant aspects of the family plan, including missing four or five drug tests). We overrule Mother's fourth issue. And after weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is factually sufficient to support the trial court's finding that termination of Father's parental rights to A.R.F. is in his best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733; *M.R.*, 243 S.W.3d at 820–21; *J.L.C.*, 194 S.W.3d at 675–77; *see also C.J.S.*, 383 S.W.3d at 691–95. We overrule Father's fourth issue.

## VI. CONCLUSION

Having overruled each of Mother's and Father's issues necessary for final disposition of the appeal, we affirm the trial court's judgment terminating Mother's and Father's parental rights to A.R.F. *See* Tex. R. App. P. 47.1.

SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  July 25, 2013